IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02595-RBJ-MJW

WARREN D. WATSON,

    Plaintiff,

v.

MATTHEW KILLOUGH, P.A.,
CORRECTIONAL HEALTHCARE SOLUTIONS,
YASEMIN TAYLOR, Nurse,
JANE DOE, Nurse,
KATHERYN TETREAULT, LPN, and
C. CROWE, Nurse,

    Defendants.

---

ORDER ON MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on defendants Correctional Healthcare Solutions', Matthew Killough's, Yasemin Taylor's, Katheryn Tetreault's, and Catherine Rowe's Motion for Summary Judgment. ECF No. 102. For the reasons explained herein, this motion is granted.

## I. BACKGROUND

**A. <u>Factual Background</u>.**

This suit arises from plaintiff Warren D. Watson's requests for medical care while he was incarcerated at Jefferson County Detention Facility ("JCDF") in Golden, Colorado as a pre-trial detainee. ECF No. 9 at 5; ECF No. 102-1 at 7. Mr. Watson was detained at JCDF from March 8, 2013 until October 15, 2015. ECF No. 9 at 5. Beginning in February 2015 Mr. Watson experienced right knee pain and swelling. *Id.* at 7; ECF No. 102-1 at 19, 23–24. These

1

symptoms persisted over an eight-month period until Mr. Watson was transferred to Fremont Correctional Facility in Canon City, Colorado in October 2015. Mr. Watson sent five medical requests—also referred to as "kites"—related to his knee pain during this eight-month period. He was seen promptly by medical personnel after each request other than his very last kite. However, he claims that his knee was not properly treated. The following is a brief summary of Mr. Watson's requests for medical attention and the evaluations and treatment he received:

- He sent his first kite on February 12, 2015. ECF No. 102-1 at 19. At that time he noticed a golf-ball sized growth on the inside of his right knee. *Id.* at 24–25. He was seen the same day by Nurse Catherine Rowe, who evaluated Mr. Watson's knee and recorded his pain based on his impressions. *Id.* at 32–36. Mr. Watson contends that despite Nurse Rowe's notes to the contrary, she did not give him an ice pack or Tylenol, nor did she provide him with either of these things within a few days of examining him. *Id.* at 35–36. Nurse Rowe referred Mr. Watson to a medical provider. *Id.* at 37.

- On February 24, 2015 Physician Assistant ("P.A.") Matthew Killough examined Mr. Watson's knee. *Id.* at 41. Mr. Watson alleges that his knee pain had increased substantially and that the size of the swelling had increased. ECF No. 9 at 8. P.A. Killough attempted to drain the growth on Mr. Watson's knee with a needle, but he was unable to do so. ECF No. 102-1 at 41. P.A. Killough gave Mr. Watson an ACE bandage and encouraged him to decrease his activity level and to continue using the painkiller Naproxen, which he was already using for pre-existing headaches. *Id.* at 43–44.

- Mr. Watson also recalls seeing P.A. Killough a second time at a later date, during which P.A. Killough examined his knee again. *Id.* at 63. P.A. Killough did not perform any tests or treatment at that time. *Id.*

- Mr. Watson sent his second kite on April 14, 2015. *Id.* at 47. He indicated that his right knee "is starting to become painful." *Id.* at 48. He asserts that he had become overwhelmed with worry about his knee and was having trouble walking. ECF No. 9 at 9. Mr. Watson was examined by a nurse about this kite on April 15, 2015. ECF No. 102-1 at 48.

- Mr. Watson sent his third kite on July 16, 2015. *Id.* at 50. He noted that his knees were painful and swollen and that the "pain seems to be more on the bone now." *Id.* at 51. Mr. Watson was seen by Licensed Practical Nurse Katheryn Tetreault the same day about this kite. *Id.*

- Mr. Watson was seen by a doctor on July 31, 2015 about a different issue, but he also discussed his knee during that visit. *Id.* at 55–56.

- Mr. Watson saw Licensed Practical Nurse Yasemin Taylor on August 4, 2015 about his right knee. *Id.* at 54–55. He complained that the knee was swelling and that he needed a wrap for it. *Id.*

- Mr. Watson sent his fourth kite on September 22, 2015 in which he noted that his knee was "[p]ainful to walk on" and requested a cane to relieve the pressure when walking. *Id.* at 57. Mr. Watson was seen on September 28th. ECF No. 9 at 10. Mr. Watson did not receive a cane. ECF No. 102-1 at 59.

- Mr. Watson sent his final kite on October 3, 2015, in which he noted that his knee was causing him extreme pain and asking again about the cane. ECF No. 102-1 at 59. He did not see any healthcare provider about this final kite.

Mr. Watson was transferred to the Denver Reception Diagnostic Center ("DRDC") in October 2015, and then a few weeks later to the Fremont Correctional Facility in Canon City, Colorado where he remains to date. *Id.* at 81–82; *see also* ECF No. 9 at 5. During his short time

3

at the DRDC his knee was evaluated and he was scheduled for X-rays, an MRI, and a biopsy. ECF No. 102-1 at 81. However, given the short timeframe of his stay at DRDC, only the X-rays were conducted. *Id.* at 81–82. The DRDC provider referred him to an outside provider who Mr. Watson visited after he was transferred to Fremont. *Id.* at 84. Mr. Watson had the growth on his knee biopsied in the summer of 2016, and the results were inconclusive. *Id.* at 85–86. He also had an MRI around that time. *Id.*

Mr. Watson underwent surgery on his knee on August 23, 2016 to remove the growth, which revealed that it was not cancerous. *Id.* at 82, 86. He testified that following the surgery his knee feels 95 percent better. *Id.* at 9. His knee issues have caused him to reevaluate his exercise and training regimen, which in turn causes him "to get depressed, to a certain point." *Id.* at 97. However, he is now able to do some of the exercises he was not able to do before his surgery. *Id.* at 98.

Mr. Watson complains that the JCDF nurses did not do enough to follow up about his knee, and that they could have informed a provider or a P.A. about the issue during the time he was held at the JCDF. *Id.* at 64, 70, 73. He acknowledges that all his kites were responded to by a nurse who would talk to him and examine his knee, with the exception of his final kite. *Id.* at 68. However, he contends that if the nurses had reported his knee problem as soon as possible it would have prevented his growth from swelling from golf ball-sized to baseball-sized. *Id.* at 73–74. Moreover, Mr. Watson contends that P.A. Killough could have found an alternate treatment or a better needle to relieve the pressure on his knee. *Id.* at 74, 87. He also contends that P.A. Killough failed to follow up on Mr. Watson's knee other than when he sent additional kites. *Id.* Finally, Mr. Watson contends that CHS should be held accountable for the actions of its

employees and that CHS failed to follow its policy of ensuring that each inmate receives proper medical care. *Id.* at 75–76.

### B. Procedural Posture.

As the Court previously summarized, Mr. Watson's *pro se* complaint sets forth one claim for relief "alleging deliberate indifference and denial of medical care in violation of the Eighth Amendment." ECF No. 13 at 2. He requests declaratory relief and money damages. *See* ECF No. 9 at 17–18. Mr. Watson sued the four known JCDF medical personnel who were involved with his case (P.A. Matthew Killough, Nurse Katheryn Tetrault, Nurse C. Rowe, and Nurse Yasemin Taylor) in their individual capacities alleging that they were all acting under the color of state law when they denied him medical treatment.[1] ECF No. 9 at 3–4, 6. He also sued CHS, which he alleges was responsible for training medical staff and maintaining medical equipment and supplies at the facility.[2] *Id.* at 3, 6. He asserts his claims against all parties under 42 U.S.C. § 1983. *Id.* at 5.

Defendants seek summary judgment with respect to the entirety of Mr. Watson's lawsuit. ECF No. 102. This motion has been fully briefed. *See* ECF Nos. 109, 110.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A

---

[1] Although Mr. Watson's complaint also named another unknown nurse identified as Jane Doe I, *see* ECF No. 9 at 4, she has not been identified or served. *See* ECF No. 88 at 1. The Court therefore previously dismissed Mr. Watson's complaint against this unknown Jane Doe nurse. *See* ECF No. 119.
[2] Mr. Watson's complaint also named Sheriff Ted Mink, but the Court dismissed that claim with prejudice for lack of personal participation. ECF No. 13 at 4.

5

fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including . . . summary judgment proceedings." *Id.* at n.3 (citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

### III. ANALYSIS

Defendants assert three grounds for granting summary judgment. First, they argue that the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), bars all of Mr. Watson's claims because he failed to exhaust his administrative remedies within the JCDF. ECF No. 102 at 2. Second, they contend that Mr. Watson's Eighth Amendment claim (which they assert is properly interpreted as a Fourteenth Amendment claim, since he was a pre-trial detainee during his time at the JCDF)[3] against defendants fails because there is no evidence that any of the individual

---

[3] Mr. Watson maintains that the Eighth Amendment is relevant in his case since he was on parole at the time of arrest. ECF No. 109 at 3. Thus, he contends that he was both a pre-trial detainee and a prisoner. *Id.* This distinction, and the resulting application of either the Eighth or the Fourteenth Amendment, is of no relevance to the outcome of this motion. Instead, this motion turns on the failure to exhaust administrative remedies before bringing a constitutional claim, regardless which Constitutional Amendment that claim arises under.

defendants had subjective intent as required for such an action. *Id.* Finally, defendants contend that Mr. Watson has failed to identify a custom, practice, or policy of CHS's, which is required for liability to attach to CHS. *Id.* at 2–3. However, because Mr. Watson's failure to exhaust his administrative remedies is dispositive in this case, the Court need not address the remaining two asserted bases for summary judgment.

Defendants contend that Mr. Watson failed to exhaust his administrate remedies as required by the PLRA when he failed to follow the JCDF's required grievance procedure for inmates who believe their civil rights or specific privileges have been abridged. ECF No. 102 at 7. The PLRA dictates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The statute defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* at § 1997e(h).

The United States Supreme Court has emphasized that while "exhaustion in cases covered by § 1997e(a)" was "[o]nce within the discretion of the district court," it is "now mandatory." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The Court explained the reasons for the exhaustion requirement, including that it would "reduce the quantity and improve the quality of prisoner suits," and that it might encourage "corrective action taken in response to an inmate's grievance," thus "improv[ing] prison administration and satisfy[ing] the inmate, thereby obviating the need for litigation." *Id.* at 525 (citing *Booth v. Churner*, 532 U.S. 731, 737 (2001)). The *Porter* Court, in turn, held that "the PLRA's exhaustion requirement applies to all

inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. Similarly, exhaustion is mandated "regardless of the relief offered through administrative procedures." *Booth*, 532 U.S. at 741. In *Booth*, for example, the Court clarified that even where the administrative procedures could not provide the relief sought—money damages, in that case—the prisoner was nonetheless required to exhaust those administrative procedures before filing suit. *Id.*

The PLRA exhaustion requirement applies in this case because Mr. Watson was a pre-trial detainee during his time at JCDF, and because his claims against both the individual plaintiffs and CHS are related to the facility conditions—namely, his medical treatment and the training and equipment provided to JCDF medical personnel—and arise under 42 U.S.C. § 1983. *See* ECF No. 9 at 3–5 (asserting that jurisdiction arises under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 and noting that each defendant was acting under the color of state law as required under section 1983).

The JCDF's grievance procedure is contained in the JCDF Inmate Handbook. It states that "[a] grievance must concern abuse, harassment, abridgement of civil rights or denial of specific privileges." ECF No. 102-2 at 38–39. The procedure dictates that:

> Prior to submitting a formal grievance, <u>you must send a kite to the on-duty sergeant within 5 days of the incident or situation explaining the incident in question. The sergeant will attempt to resolve the matter informally</u>. If the Sergeant is unable to resolve the matter and the complaint meets the grievance requirements; a grievance will be issued. If issued, you must submit the grievance for investigation within 24 hours of receiving it.
>
> The grievance shall fully state the date, time, and location of the incident or situation, name(s) of person(s) involved and complete details of the incident or situation. [. . .]
>
> After review and subsequent investigation of the grievance, a staff member will respond to you in writing, advising of the results of the investigation. Any disciplinary action taken against staff members will not be divulged.

> If you are not satisfied with the disposition of your grievance, you may appeal that disposition, in writing, within 5 days of the receipt of the response, to a Detentions Lieutenant. The Lieutenant, or designee, will review the appeal, and respond to you in writing.

*Id.* (emphasis in original).

I agree with defendants that Mr. Watson has failed to exhaust the administrative remedies outlined in the handbook for resolving his complaints. Mr. Watson has asserted constitutional claims against defendants for deliberate indifference and cruel and unusual punishment, which would fit into the category of claims for an "abridgement of civil rights" as contemplated in the JCDF handbook's "Grievances" section. *See id.* Mr. Watson did not file a grievance while at JCDF. ECF No. 9 at 16. Thus, Mr. Watson's failure to follow the procedures set out in this section constitutes a failure to exhaust the administrative remedies available to him.

However, Mr. Watson contends that the relevant section of the handbook was not the grievance procedure cited by defendants but instead the guidelines contained in the "Medical Services" section. ECF No. 109 at 2. This section of the handbook provides that "Complaints/Grievances regarding medical services should be submitted on an Administrative "Kite" (not the Medical Request Form/medical kite) to the Health Services Administrator." *Id.* (citing JCDF Handbook at 27). Nonetheless, even if Mr. Watson were justified in believing that the remedies set out in the "Grievances" section of the handbook were not relevant to him and that he should instead follow the procedure outlined in the "Medical Services" section, *i.e.*, by sending an Administrative Kite rather than a medical kite, he also failed to follow that procedure. *See id.* at 27. Instead, he simply continued sending medical kites—the majority of which were promptly answered—until he left the facility. At no time did he file an "Administrative Kite" as required by this section of the handbook. As a result, defendants were not put on notice that Mr.

Watson perceived any wrongdoing or insufficiency in the medical treatment he was receiving until he filed this complaint, which is the very reason for the exhaustion requirement. *See Porter*, 534 U.S. at 525.

I am not satisfied by Mr. Watson's testimony that he believed he was filing grievances by sending medical kites. *See* ECF No. 102-1 at 120–21 ("I believe that when I was filing the Kites, I was grieving my knee, through the Medical."). He testified that he was aware that JCDF had a grievance system, but that in his opinion, the kite system was no different from the grievance system. *Id.* However, Mr. Watson also testified in a somewhat contradictory manner, asserting that he did not know one way or another whether JCDF had a grievance system, and acknowledging that nothing he filed was called a "Grievance." *Id.* at 122–23. Regardless of what Mr. Watson actually knew, he acknowledged that he received a copy of the inmate handbook, which provides on the first page that each inmate "will be held accountable for the information contained in this Handbook." ECF No. 102-2 at 1. As such, Mr. Watson was required to familiarize himself with the terms and requirements of the handbook, and may not now claim that he was ignorant of the requirements therein. Moreover, a detainee's lack of awareness about grievance procedures does not excuse his failure to exhaust them. *Gonzales-Liranza v. Naranjo*, 76 F. App'x 270, 272–73 (10th Cir. 2003). Therefore, even if Mr. Watson were unaware of the required grievance procedure, his ignorance is no excuse for failing to follow those procedures and instead simply continuing to file medical kites.

Finally, apparently conceding that he failed to use either administrative remedy that could plausibly be derived from the handbook, Mr. Watson argues that his failure to "use the standard procedures for exhaustion of remedies" should be excused because "he had already been relocated from the county jail to the department of [] corrections shortly after his last request for

medical attention had been submitted." ECF No. 109 at 2. I am similarly not satisfied by this excuse. As the record indicates, his last request for medical attention was sent October 3, 2015, and he was relocated to DRDC on October 15, 2015. This represents nearly two weeks in which he might have filed a grievance. Moreover, Mr. Watson's complaints about individual medical personnel at JCDF—and CHS, by extension—are based on events that occurred in February, July, and August 2015. *See* ECF No. 102-1 at 32–36, 41, 51, 54–55. He therefore could have filed a grievance at any point after seeing these medical personnel and being dissatisfied with their services; there was no reason for him to wait until October to file a grievance. Moreover, courts "will not read futility or other exceptions into [PLRA's] statutory exhaustion requirement." *Booth*, 532 U.S. 731, 741 n.6. Thus, even if Mr. Watson's grievance would have been futile given his imminent move to a new facility, he was still required to file a grievance and exhaust this administrative requirement before bringing the present suit.

Thus, because Mr. Watson failed to exhaust JCDF's administrative remedies as required by the PLRA with respect to his complaints about the medical services he received, he may not assert a § 1983 action against the individually named plaintiffs and CHS. In the interest of judicial efficiency, the Court need not and will not reach defendants' alternative arguments in favor of summary judgment.

## ORDER

For the reasons stated herein, defendants' motion for summary judgment is GRANTED. Mr. Watson's complaint is DISMISSED with prejudice for failure to exhaust the JCDF administrative remedies.

DATED this 25th day of July, 2018.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge